STATE *vs.* GERALD MASTRACCHIO.

AUGUST 7, 1951.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

FLYNN, C. J.   This indictment charged that the defendant on April 6, 1949 at Providence did assault Umberto Colangelo with intent to rob him.   A jury in the superior court found defendant guilty as charged and thereafter his motion for a new trial was denied by the trial justice.   The case is before this court on defendant's bill of exceptions to that and other rulings during the trial.   However, he now relies only on exceptions numbered 2, 11, 13 and 14, all others being expressly waived.

The evidence for the state showed the following among other facts.   On April 6, 1949, about 10:30 to 10:40 a.m., Umberto Colangelo, hereinafter referred to as Umberto, was in the upstairs bedroom of his home at 45 Mink road in the city of Providence.   He was then almost eighteen years of age and lived with his mother and four sisters, all of whom had gone out that morning.   The doorbell rang,

and expecting that his mother was returning he went downstairs to answer the bell. Upon opening the front door he was confronted by a young man who asked if he was "Mr. Colangelo." Umberto stated that he was and then the man at the door pulled a nickel-plated revolver from his right coat pocket, pointed it at him, and ordered him to step back into the house. The front door opened directly into the living room, and Umberto complied with the order. As he walked backwards four to six feet into the living room he kept looking at his assailant. The man with the gun then asked if he were alone in the house, and when Umberto admitted that he was the gunman ordered him to "lay face first down on the floor."

He complied with such order and at this point the gunman called two men, who were outside, to come into the house and directed one of them to watch Umberto. Then he and the other accomplice proceeded to a bedroom off the kitchen on the first floor. The men were in the house between three and five minutes when a car conveying Umberto's mother, brother and sister-in-law arrived. Thereupon the man guarding Umberto shouted to the others "someone is coming," and the three intruders started toward the front door. By that time the mother had entered the house, saw the men and screamed, and Umberto's brother came from his car. As he reached the front door the three men brushed by him. Meanwhile Umberto had arisen from the floor and ran out after them. He saw one of the men get into a car, which had been parked in front of the house, and the other two ran down the street to a corner where they also entered that car. After the men had gone Umberto and the members of his family found the bedroom had been ransacked, although nothing was missing.

None of Umberto's family had sufficient opportunity to see the features of any of these men. Only Umberto was able to identify the man who had come to the door and

pointed a gun at him. In this respect he told the police, who arrived in response to a summons, that his assailant was a young man about 5 feet 7 inches tall, wearing a gray soft hat and a topcoat or raincoat. Later the defendant was arrested, indicted and tried on the instant indictment.

At the time of trial Umberto was nineteen years of age and attending college. In the courtroom he positively and unqualifiedly identified the defendant as the man who had pointed the gun at him on April 6, 1949 and had ordered him to step back into the house and then to "lay face first down on the floor." He also described the color of the hat, coat and pigskin gloves worn by defendant at that time, and in cross-examination testified that defendant's hat was tilted slightly toward but not in any way so as to cover his eyes.

On the other hand defendant did not testify personally but presented evidence through others in order to make out the defense of an alibi. According to his principal witness, Harry Baccari, who had been a friend since grammar school days, defendant was with him substantially from 9:30 a.m. until about noon on April 6, 1949 and was not at or near the Colangelo home during those hours. He testified that he worked in a cafe operated by Joseph Cataldo, his cousin; that defendant came there about 9:30 o'clock in the morning at which time he and defendant left the cafe in an automobile; that Baccari then drove to the Narragansett Electric Company's office at Weybosset and Exchange streets in Providence to pay Cataldo's electric bill; and that the money therefor had been given him by Cataldo on the previous day. Because of parking difficulties Baccari drove around the block three or four minutes while defendant went to the company's office and paid the bill. From there they went to the Infantry Bar on South Main street, which Cataldo had formerly owned. The purpose of this visit is not too clear, but they left about 10:30 o'clock and drove to the Fairmont Motor

Sales on Smithfield avenue, Pawtucket, where they wanted to see the proprietor about a used car. They arrived there about 11 o'clock and stayed about fifteen or twenty minutes without seeing the proprietor or talking business with anyone, and then, without giving any particular reason therefor, drove to the Wanskuck Club, where Baccari left defendant sometime between 11:30 and 11:45 a.m.

Another witness, Earl J. Marotte, whose brother-in-law was the proprietor of Fairmont Motor Sales, testified that between approximately 11 and 11:30 o'clock on a cloudy or rainy day during the first week in April, Baccari and defendant had come to see the proprietor; that the latter was not there at the time but was expected to arrive so that the witness could go to lunch around 12 o'clock; that defendant and Baccari nevertheless did not wait to see him, did not talk business, and did not come back at any time thereafter. He fixed the time of their leaving by the fact that the proprietor returned about noontime, which was about twenty minutes after they had left.

The records of the Narragansett Electric Company were submitted through another witness and showed that the bill of Cataldo was paid on April 6, 1949. No witness or records of the company could show at what time the bill was actually paid that day, or who made the payment. It was testified, however, that the bill did not relate to an adjustment, which was the particular reason assigned by Baccari for his recollection of the presence of defendant on that day.

After a fair and explicit charge to which defendant took no exception, the jury returned a verdict of guilty. Thereafter defendant filed his motion for a new trial upon the usual grounds, and also on the ground of newly discovered evidence. However, at the hearing thereon no affidavit of newly discovered evidence was presented to support such ground, and after consideration the trial justice denied the motion and approved the verdict.

The defendant's second exception appears to be addressed to several rulings on different questions. Assuming, however, that these can be considered as separately and properly stated, we are of the opinion that there was no error in the rulings related to question 179 which are here argued. The purpose of defendant's counsel in asking "Where?" Umberto saw the defendant next after the day of the crime, which is question 179, is explained best by his statement to the court that "if by some other evidence he [attorney general] is going to bring in some further evidence along those lines, I think I have a right to go into that." Disallowance of this attempt to anticipate possible evidence which had not then appeared by the witness' direct examination did not constitute an unreasonable restriction of defendant's right to cross-examine.

The defendant's other claim under this exception is to the refusal of an offer of proof concerning what his counsel asserts the state's witness would testify to if defendant were permitted to pursue the cross-examination as indicated in this question. No authority has been cited for such an unusual procedure. Obviously the substance of the offer was beyond the reasonable limits of the witness' direct examination. If such testimony were desired and relevant defendant could have called Umberto as his own witness in defense. Defendant here was not attempting to lay any foundation for later impeachment of the witness. We find nothing in reason or practice to suggest that counsel during cross-examination of a state's witness may introduce independent evidence in defendant's behalf by an offer of proof, especially when such offer clearly exceeds the reasonable limits of the witness' direct testimony. In the circumstances the defendant's claim of prejudice under the second exception as stated is without merit.

Under exception 11 defendant argues that the trial justice erred in denying his motion for a directed verdict. We need not recite the evidence in detail, which clearly raised

502

material issues of fact requiring the trial justice to submit the case to the jury. This exception is without merit.

The next contention of defendant is that the trial court erred in failing to charge the jury specially with reference to certain remarks allegedly made by the state's counsel in his argument to the jury. This contention is made under exception 13, which appears in the bill of exceptions as follows:

"To the refusal of the Court to charge the Jury to disregard the question asked by Mr. Fazzano in his argument, of the defendant, 'Mr. Mastrocchio, why don't you tell us where the other two men are?', appearing in the record as the defendant's request to charge as follows:
'Request To Charge
In view of the remarks of Mr. Fazzano called to the Court's attention, the defendant respectfully requests the Court to charge specifically and emphatically that the defendant is not required to—
(1) Put in any defense whatever.
(2) Is not required to take the stand or testify and no inferences can be made therefrom.
(3) That the jury should disregard the statement to that effect by Mr. Fazzano.' "

However, we find that no such exception was taken or noted in the transcript. In another place and before the general charge of the court defendant had objected to a certain portion of the state's argument and had requested merely that the substance thereof be quoted in the record. But at that time the court was not asked to make any ruling in the matter or to charge specially, and no exception to any ruling of the court was then asked by defendant or noted. It is clear that defendant had merely objected to an alleged portion of the state's argument without asking for and receiving a ruling or decision from the court to which an exception could properly be taken. *State* v. *Farr,*

29 R. I. 72; *State* v. *Riddell,* 38 R. I. 506; *State* v. *Hathaway,* 52 R. I. 492.

After completion of the arguments and at the conclusion of the charge, to which no exception was taken and which fully and specifically instructed the jury as to the law on defendant's right to refrain from testifying, the transcript shows the following:

"The Court: Is there anything you would like to have me say, Mr. McElroy?
(Mr. McElroy approached the Bench and made an off the record statement.)
The Court: No. I think I have made it plain to you, Mr. Foreman and members of the jury. I reiterate it that of course the burden is on the State to prove its case. The defendant does not have to prove he is innocent. The State has to prove beyond a reasonable doubt, as I have described it to you that he is guilty. I think I have made it plain, but in the event I haven't, I do reiterate that to you.
Now, Mr. McElroy, I will give you an exception to Mr. Fazzano's reference to the other two men.
(Defendant's Exception Noted.)"

Up to and including this colloquy there is no mention whatever in the transcript of any request, written or oral, to charge specially in connection with the alleged improper arguments as set forth in exception 13. The transcript merely shows that defendant's counsel "made an off the record statement," the nature of which is not stated. The additional charge by the court which followed immediately contains no statement prejudicial to defendant, but on the contrary reiterated the necessity for the state to prove beyond a reasonable doubt all the essentials of the crime, an instruction that previously had been given in full. The concluding statement of the court did not note defendant's exception to any ruling or decision but merely "to Mr. Fazzano's reference to the other two men." That is consistent with the substance of defendant's previous request as it appears earlier in the transcript. In our judgment

the instant record cannot be extended reasonably to include a request for a specific charge as stated in the bill of exceptions but which does not appear in the transcript, an adverse ruling thereon by the court, and an exception to such ruling or decision by defendant. In the peculiar circumstances we are of the opinion that there is no exception in the transcript which corresponds to exception 13 as stated in the bill of exceptions, and the case is governed in that respect by the law stated in the above-mentioned cases.

The defendant finally contends under exception 14 that the trial justice erred in denying his motion for a new trial. The trial justice in a rescript summarized the evidence, pointed out the importance of the credibility of the witnesses, and expressly stated that he was satisfied that Umberto Colangelo had sufficient opportunity to recognize the defendant and that he was correct in his positive identification. The court further stated that he "was favorably impressed with the appearance of Umberto Colangelo and with his apparent intelligence," and that there was ample evidence to sustain the verdict which he independently approved. We find nothing in the rescript to suggest that the trial justice misconceived his duty or the applicable law, or that he overlooked any material evidence. It is not necessary to state in detail the evidence which would justify the jury and the trial justice in believing Umberto and in refusing to accept as credible the evidence submitted by witnesses to prove an alibi for the defendant. There was ample evidence, if believed, to show beyond a reasonable doubt that defendant was the person who assaulted Umberto Colangelo on the morning of April 6, 1949 and had then gone through a part of the house for the purpose of committing a robbery. From our examination of the transcript we cannot say that the trial justice was clearly wrong in denying the defendant's motion for a new trial. This exception is overruled.

All of the defendant's exceptions are overruled, and the case is remitted to the superior court.

*William E. Powers,* Atty. Gen., *Francis J. Fazzano,* Ass't Atty. Gen., for State.

*McKiernan, McElroy & Going, Edward F. McElroy, Michael Addeo,* for defendant.